[Cite as *State v. Smith*, 2024-Ohio-1360.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | Nos. 112214 and 113039 |
| v. | : | |
| ASHUNTE SMITH, ET AL., | : | |
| Defendants-Appellants. | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED
IN PART AND REMANDED
**RELEASED AND JOURNALIZED:** April 11, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-95-323987-ZA, CR-95-325283-ZA, and CR-95-327616-ZA

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Daniel T. Van and Tasha Forchione,
Assistant Prosecuting Attorneys, *for appellee*.

Kimberly Kendall Corral and Gabrielle M. Ploplis, *for
appellants*.

EILEEN A. GALLAGHER, P.J.:

{¶ 1} In this consolidated appeal, defendants-appellants Ashunte Smith

("Ashunte") and Willie Smith ("Willie") (collectively, "appellants" or "the Smiths")

appeal the trial court's denial of their separate motions for leave to file a motion for

a new trial under Crim.R. 33(A)(6) and (B). Appellants contend that they were unavoidably prevented from timely discovering new evidence that undermined their convictions for kidnapping and aggravated murder and that the trial court abused its discretion in denying their motions for leave without a hearing. Specifically, appellants claim that they were unavoidably prevented from timely discovering that William Marshall ("Marshall") (one of the state's key witnesses) recanted his trial testimony. Appellants also claim that Willie was unavoidably prevented from timely discovering new information contained within the transcripts from Ashunte's trial, which he contends revealed contradictions and inconsistencies in witnesses' testimony.

{¶ 2} For the reasons that follow, we find that, as it relates to Marshall's recantation of his trial testimony, the trial court abused its discretion in denying appellants' motions for leave to file a motion for a new trial without a hearing. We reverse the trial court and remand for a hearing on appellants' motions for leave to file a motion for a new trial based on that evidence. We affirm the trial court as it relates to the new information allegedly contained within the transcripts from Ashunte's trial.

**Factual Background and Procedural History**

{¶ 3} In 1995, Willie and his younger brother Ashunte were charged with the kidnapping and murder of Reginald Gary Lewis a.k.a. "Reggie" ("Lewis"). On April 19, 1995, Lewis' body was found in a creek behind the Dalebridge Apartments in Warrensville Heights. The Cuyahoga County Coroner determined that Lewis had

suffered blunt force trauma and gunshot wounds, that his cause of death was two gunshot wounds to the back of his head and that the manner of death was homicide. The state's theory of the case was that Willie and Ashunte had killed Lewis in retaliation for Lewis' alleged shooting of their cousin, Marshall, a month or so earlier. The state claimed that the brothers had abducted Lewis, then took him to the basement of Marshall's home, where they shot and killed Lewis. Blood of the same type and enzyme pattern as Lewis' and a spent 9 mm bullet was found in the basement of Marshall's home. At the time of Lewis' death, Willie was 19, Ashunte was 15 and Marshall was 16.

{¶ 4} Willie and Ashunte were tried in separate jury trials.[1] Willie's trial commenced on September 25, 1995, and the jury rendered its verdicts against Willie on October 6, 1995.[2] The jury found Willie guilty of kidnapping in violation of R.C. 2905.01 and aggravated murder in violation of R.C. 2903.01(B). The jury found Willie not guilty of the firearm and felony-murder specifications accompanying the aggravated murder charge and also found Willie not guilty of aggravated murder in violation of R.C. 2903.01(A) and having weapons while under disability. The trial court sentenced Willie to life in prison on the aggravated murder count and to 10 to

---

[1] Ashunte was bound over from juvenile court and tried as an adult. The procedural history leading to his bindover is detailed in *State v. Smith*, 8th Dist. Cuyahoga No. 70855, 1997 Ohio App. LEXIS 3760, 5 (Aug. 21, 1997), and *Smith v. Bradshaw*, 5th Dist. Richland No. 05-CA-66, 2005-Ohio-5403.

[2] In their appellate brief, appellants assert that the jury returned its verdicts in Willie's case on October 24, 1995. However, the record reflects that the jury returned its verdicts on October 6, 1995.

25 years on the kidnapping count, to be served consecutively, and ordered Willie to pay a $35,000 fine. On appeal, this court affirmed Willie's convictions. *State v. Smith*, 8th Dist. Cuyahoga Nos. 69799, 70451, and 71643, 1997 Ohio App. LEXIS 4892 (Nov. 6, 1997), *appeal not accepted*, 81 Ohio St.3d 1467, 690 N.E.2d 1287 (1998).

{¶ 5} Ashunte's trial commenced on May 14, 1996, and the jury rendered its verdicts against Ashunte on May 22, 1996. The jury found Ashunte guilty of kidnapping in violation of R.C. 2905.01(A) with a firearm specification, aggravated murder in violation of R.C. 2903.01(A) with a firearm specification and aggravated murder in violation of R.C. 2903.01(B) with a firearm specification. The trial court sentenced Ashunte to 11 to 18 years on the kidnapping count (three years on the firearm specification to be served prior to and consecutive to 8 to 15 years on the underlying offense) and to life plus three years (three years of the firearm specification to be served prior to and consecutive to a life sentence on the underlying offense) on each of the aggravated murder counts. The sentences were to be served concurrently. On appeal, this court merged the aggravated murder counts for sentencing. The court otherwise affirmed Ashunte's convictions. *State v. Smith*, 8th Dist. Cuyahoga No. 70855, 1997 Ohio App. LEXIS 3760 (Aug. 21, 1997), *appeal not accepted*, 81 Ohio St.3d 1414, 688 N.E.2d 1042 (1998).

{¶ 6} Marshall was a key witness for the state in both brothers' trials. Before Willie's trial, Marshall, who had been charged with murder, entered into a plea agreement with the state. Under the terms of the plea agreement, Marshall agreed

(1) to give a "full statement" to police, (2) to testify against Willie and Ashunte in their trials and (3) to plead guilty to complicity to involuntary manslaughter for his role in Lewis' death. In exchange, the state withdrew its motion to have Marshall bound over for trial as an adult and Marshall remained in the juvenile court system and was sentenced to a juvenile facility "for a term of one year until he's to reach 21 years of age." If Marshall testified "truthfully" in the cases against Willie and Ashunte and cooperated with the Warrensville Heights Police and the Cuyahoga County Prosecutor's Office, the prosecutor's office would write a letter to the Ohio Department of Youth Services ("ODYS"), informing ODYS of Marshall's cooperation and request that Marshall be released after one year. (Willie's trial tr. at 599-601, 715-717.) Marshall gave a statement to police on June 14, 1995. He was sentenced to the Training Institute of Central Ohio on June 16, 1995. He testified in Willie's trial on September 29, 1995 and in Ashunte's trial on May 17, 1996.

{¶ 7} A brief summary of the trial testimony relevant to the issues raised in this appeal follows.[3]

**Willie's Trial**

{¶ 8} In Willie's trial, Marshall testified that he had been shot by an unknown, masked assailant in February 1995 and that it was rumored in the neighborhood that an individual named "Reggie" was responsible for the shooting.

---

[3] A more complete description of the evidence presented at Willie's trial can be found in *Smith*, 1997 Ohio App. LEXIS 4892. A more complete description of the evidence presented at Ashunte's trial can be found in *Smith*, 1997 Ohio App. LEXIS 3760.

{¶ 9} Marshall testified that on March 28, 1995, he left school early after he was involved in a fight. Marshall indicated that he arrived at home, where he lived with his grandmother, at approximately 1:30 p.m. His grandmother was not home. Marshall stated that he was drinking beer and that, shortly after he came home, his cousins, Willie and Ashunte, came over in a small white car with another male (later identified as Lewis). Marshall testified that Willie and Ashunte told Marshall that Lewis was the person who had shot Marshall.

{¶ 10} According to Marshall, Willie and Ashunte entered their grandmother's house and went down to the basement with Lewis. Willie asked Marshall if their grandmother was home. After Marshall informed his cousins that their grandmother was not home, they instructed Marshall to get something to tie up Lewis. Marshall brought them an extension cord and Ashunte used it to tie Lewis to a pole in the basement. Marshall stated that he told Willie and Ashunte that he did not know "for sure" if Lewis had been the person that shot him "because he had a mask on" but that "[h]e look[ed] like the same size and everything."

{¶ 11} Marshall testified that the telephone rang and he went upstairs to answer it; his grandmother had called. After speaking with his grandmother, Marshall returned to the basement. He told Willie and Ashunte that "whatever you all going to do, you better do it" because their grandmother would be home soon.

{¶ 12} Marshall stated that Willie pulled a gun from the waistband of his pants, "something like a nine millimeter," and said, "We're going to do him then." Willie cocked the gun and told Marshall to go upstairs and "[m]ake sure Grandma

don't pull up or nothing." Marshall complied. He stated that he heard two shots and when he looked back downstairs, Ashunte was holding the gun and Lewis lay on the floor, dead.

{¶ 13} Marshall testified that appellants told him to get some sheets in which to put the body and that he got some sheets from his bedroom and returned to the basement, where they untied Lewis, picked him up, wrapped him in the sheets and dragged him upstairs. Marshall held the door open as Willie and Ashunte carried the body out, opened the trunk of the white car and put Lewis into the trunk. Willie and Ashunte told Marshall to clean up the blood and drove away. After they left, Marshall attempted to clean up the blood in the basement.

{¶ 14} Shenelle Owens testified that, earlier that day, Willie and Ashunte had confronted Lewis at her house and asked him if he was the person who had shot Marshall. She stated that Lewis denied that he had shot Marshall and that Willie and Ashunte began beating him up, chased him down the street and ultimately "put" Lewis into a small white car as he fought back.

{¶ 15} Sarah Marshall, the grandmother of Willie, Ashunte and Marshall, testified that she left her home at approximately 12:15 p.m. on March 28, 1995, went to lunch and ran some errands. After eating lunch, she called home at approximately 2:30 or 3:00 p.m. and spoke to Marshall. Sarah Marshall told Marshall that she would be home soon but she did not, in fact, return home until after 6:30 or 7:00 p.m. that evening. Before returning home, sometime after 4:00 p.m., Sarah Marshall stopped at a hardware store. As she was leaving the store and getting into

her car, she saw Willie driving a white car with Ashunte and two of his friends, Rasheen Bledsoe and "Digger," and spoke with Willie. Sarah Marshall testified that she called Marshall a second time from a girlfriend's house before returning home and again told him she would be home shortly. Sarah Marshall stated that she went into her basement the next day but did not notice anything unusual. Sarah Marshall testified that sometime in February 1995, Willie had told her that it was rumored that someone named "Reggie" had shot Marshall.

{¶ 16} No defense witnesses testified in Willie's trial.

**Ashunte's Trial**

{¶ 17} Marshall's testimony in Ashunte's trial was similar to that in Willie's trial. Marshall testified that he had been shot by an unknown, masked assailant in February 1995 in an apparent robbery attempt and that it was rumored in the neighborhood that a person named "Reggie" was responsible for the shooting.

{¶ 18} Marshall indicated that, on March 28, 1995, he left school at 12:30 p.m. after getting into a fight. Marshall stated that he arrived at home, where he lived with his grandmother, at approximately 1:30 p.m. Marshall testified that, approximately 10 or 20 minutes later, he was drinking beer when the doorbell rang and Marshall saw Willie and Ashunte at his side door and a white car parked in the driveway. Marshall opened the door, greeted them and his cousins asked him where their grandmother was. Marshall told Willie and Ashunte she was not home. Willie and Ashunte then advised Marshall that they had the male who shot him in the car.

{¶ 19} Marshall testified that Willie, Ashunte and the male who had been in the car (later identified as Lewis) entered the house and Willie and Ashunte asked Marshall to get something with which to tie him up. Marshall testified that he had never seen the male before. Marshall went upstairs and got an extension cord, then went to the basement where his cousins had brought Lewis. Willie and Ashunte tied Lewis to a pole in the basement. One of his cousins asked Marshall whether "he look like the guy who shot you man?" Marshall testified that he responded he did not know because the shooter had been wearing a mask. His cousin replied, "[M]an this him. This is what everyone said in the hood."

{¶ 20} The telephone rang, and Marshall went upstairs to answer it; his grandmother had called. After speaking with his grandmother, Marshall told his cousins that "whatever y'all going to do, y'all better do it," because their grandmother was on her way home. Willie responded, "We're going to do him then," and pulled a black 9 mm gun or "something like that" from the waistband of his jeans. Willie told Marshall to look out the side door to make sure no one pulled up. Marshall complied. While looking out the door, approximately 30 seconds later, Marshall heard two shots, fired approximately five to ten seconds apart. Marshall looked down the steps and saw Ashunte holding the gun and Lewis lying on the floor. Lewis appeared to be dead.

{¶ 21} Marshall testified that one of his cousins told him to get something in which to wrap Lewis. Marshall retrieved a blanket from his bed and brought it to the basement. One of his cousins untied Lewis and they put him in the blanket,

using it as a sling. Marshall helped carry Lewis up the stairs and out of the house. Lewis was placed into the trunk of the white car. Willie and Ashunte told Marshall to clean up the basement and they drove away. Marshall then attempted to clean up the blood in the basement. Marshall claimed to be "real drunk" at the time the incident occurred.

{¶ 22} Shenelle Owens testified that, earlier that day, Lewis had been at her house when Willie and Ashunte drove by, along with Bledsoe and Digger. They got out of the car, Willie said something to Lewis and Willie and Ashunte began beating Lewis. Lewis attempted to fight back and get away. Owens testified that Lewis said, "I ain't shoot your cousin" and "[T]ake me to your cousin." She stated that she was "kind of confused" about what happened next, but that Lewis left in the car with Willie, Ashunte, Bledsoe and Digger. Owens stated that she did not know if they "shoved" Lewis in the car or if he just "got in."

{¶ 23} Sarah Marshall testified that she left home at approximately 12:15 or 12:30 p.m. on March 28, 1995, went to lunch and then ran some errands. Before leaving the restaurant, she called home, at approximately 2:20 or 2:30 p.m., and spoke to Marshall. Sarah Marshall told Marshall that she would be home "later, after while." As she was leaving a hardware store, sometime between 4:00 and 4:30 p.m., she saw Willie driving a white car with Ashunte and two of his friends. She spoke with Willie "a little while" and told him to "be careful driving that car." She testified that she called Marshall a second time from her girlfriend's house, between 6:45 and 7:00 p.m., and told him she was on her way home. She arrived home a

little after 7:00 p.m. Sarah Marshall stated that when she arrived home, she did not notice anything unusual nor did she did notice anything unusual when she went to her basement the following day. Sarah Marshall testified that there were rumors in the neighborhood that "someone named Reginald Lewis" had been the person who shot Marshall in February 1995 and that Willie had told her, approximately three weeks after the shooting, that he had heard that Lewis had shot Marshall. She stated that she didn't "know it for a fact" but that in April 1995, when they were searching her home, Warrensville police detectives told her that "they were sure Reginald Lewis shot him."

{¶ 24} At Ashunte's trial, Ashunte and five witnesses testified in his defense. Ashunte testified that one morning in late March 1995, he and Willie had been driving around in a white car Willie had borrowed from a friend along with two friends, Bledsoe and Clarence Brown a.k.a. "Digger," when they saw Lewis sitting on Owens' porch. Owens flagged them down and told them to come see Lewis, who had been beaten up. Ashunte testified that he and Willie struck Lewis. After the fight stopped, Lewis told Ashunte and Willie that he was not the person who had shot their cousin and asked to be taken to Marshall. Ashunte stated that Lewis entered their car willingly and that they drove to Banbury Estates, an apartment complex in Warrensville Heights where they met another cousin, Shawn Laney, and his friend Ronnie Johnson. Everyone drove to the home of one of Ashunte's aunts, Kitt Marshall a.k.a. Kitt Laster ("Kitt"), and were sitting in the driveway, talking.

Ashunte testified that the last time he saw Lewis, he was getting into Johnson's truck with Laney and Johnson.

{¶ 25} Ashunte testified that while he and Marshall were both in the detention center, Marshall confessed to him that he had shot Lewis. According to Ashunte, Marshall told him that Laney and Johnson had brought Lewis to the basement of Marshall's home. Marshall retrieved his gun and began hitting Lewis with it. Marshall gave his gun to Laney, who shot Lewis in the head. Marshall then took the gun back from Laney and shot Lewis in the head a second time. Ashunte stated that Marshall then told him that Laney and Johnson took the body away. Ashunte claimed that, according to Marshall, their grandmother was home at the time and answered the door when Laney and Johnson arrived. Ashunte denied having threatened, kidnapped or caused any harm to Lewis.

{¶ 26} Bledsoe and Brown testified that they last saw Lewis getting into a vehicle with Laney and someone else.

{¶ 27} Ashunte's uncle, Donald Laster, and his aunt, Kitt, testified that they had seen Ashunte and Willie in their driveway with "Reggie," the person who was rumored to have shot Marshall. They testified that Marshall confessed to each of them that he had shot Lewis.

{¶ 28} Jermell Moore testified that Marshall told him on the bus that he and "Shawn" had killed Lewis. He testified that Ashunte told him that Ashunte and Willie had gotten into a fight with Lewis and that Ashunte and Willie then took Lewis to Marshall's house and left him there.

**Postconviction Proceedings**

{¶ 29} In addition to their direct appeals, appellants filed multiple postconviction petitions and motions.

**Willie's Postconviction Filings**

{¶ 30} On September 20, 1996, while his direct appeal was pending, Willie filed a motion for leave to file a motion for a new trial instanter, or in the alternative, a petition for postconviction relief pursuant to R.C. 2953.21. Willie claimed that he was entitled to a new trial pursuant to Crim.R. 33(A)(2) because Marshall had lied during his trial to conceal the fact that he had shot Lewis and witnesses had submitted affidavits stating (1) Marshall had admitted to them that he had lied about Willie's involvement in Lewis' death, (2) they had been threatened with bodily harm if they testified at Willie's trial and (3) they did not tell the whole truth when testifying for the state. Willie also claimed that his constitutional rights were violated because (1) state witnesses had lied under oath and (2) exculpatory evidence existed that was not presented at his trial. Attached to the motion were several affidavits submitted by friends and family, attesting to various facts surrounding the murder.[4]

---

[4] In *State v. Smith*, 8th Dist. Cuyahoga No. 75178, 1999 Ohio App. LEXIS 1575, 2-3 (Apr. 8, 1999), this court described the evidence Willie submitted in support of his motion/petition as follows:

> Petitioner submitted seven sworn affidavits in support of his petition. Three of the affidavits were from relatives of petitioner. Donald Laster, petitioner's uncle, stated that William Marshall had bragged to him about shooting Reginald Lewis. Laster also stated that Marshall had told him that he lied at petitioner's trial about petitioner's involvement in the crimes. Kitt

{¶ 31} On October 23, 1996, the trial court denied Willie's motion for leave to file a new trial motion instanter and dismissed his petition for postconviction relief without an evidentiary hearing. On August 5, 1998, the trial court issued findings of fact and conclusions of law with respect to its dismissal of the petition. On appeal, this court again stated that the trial court had properly denied Willie's motion for leave to file a motion for a new trial for lack of jurisdiction due to the then-pending appeal[5] but held that the trial court had abused its discretion in dismissing Willie's petition for postconviction relief without holding an evidentiary hearing to determine the credibility of the witnesses' affidavit testimony. It reversed and remanded the case for further proceedings. *State v. Smith*, 8th Dist. Cuyahoga

---

Marshall, petitioner's aunt, averred that Marshall had admitted to her that he killed Reginald Lewis. In her affidavit, petitioner's mother, Lucretia Smith, stated that Shenell[e] Owens, a friend of petitioner, told Smith that she lied at petitioner's trial.

Four of the affidavits were from friends of petitioner. Rasheen Bledsoe and Clarence Brown averred that they were willing to testify favorably for Willie at his trial but received threatening phone calls and, consequently, did not testify. Another friend, Jermell Moore, stated that Marshall told him that he and his cousin, Shawn Laney, had killed Lewis. Finally, in a handwritten affidavit, Shenell[e] Owens stated that she had not testified truthfully at petitioner's trial because petitioner had agreed to testify against her brother in an unrelated murder case.

[5] In his direct appeal, Willie had asserted as his tenth assignment of error that the trial court had improperly denied his motion for leave to file a motion for a new trial because Willie had presented affidavits from witnesses who claimed that Marshall had lied about Willie's involvement in the kidnapping and murder to the trial court. This court overruled the assignment of error, observing that "when an appeal is pending, the trial court is divested of jurisdiction except to take action in aid of the appeal." *Smith*, 1997 Ohio App. LEXIS 4892, at 30-31.

No. 75178, 1999 Ohio App. LEXIS 1575 (Apr. 8, 1999), *appeal not accepted*, 86 Ohio St.3d 1443, 713 N.E.2d 1053 (1999).

{¶ 32} On remand, after conducting an evidentiary hearing, the trial court denied Willie's request for a new trial, finding that the affidavits and witness testimony presented at the hearing[6] were not credible. On appeal, this court affirmed the trial court. The court found that Willie was not unavoidably prevented from timely discovering the evidence at issue because Kitt, Bledsoe and Brown were available before trial and their testimony surrounding the events was discoverable. With respect to Owens, the court held that the trial court did not err in discrediting her affidavit because, at the hearing, she denied that she was recanting her prior testimony and confirmed she had testified truthfully. *State v. Smith*, 8th Dist. Cuyahoga No. 78229, 2001 Ohio App. LEXIS 2076 (May 10, 2001), *appeal not accepted*, 93 Ohio St.3d 1427, 755 N.E.2d 351 (2001).

{¶ 33} On January 30, 2006, Willie, pro se, filed a second motion for leave to file a motion for a new trial pursuant to Crim.R. 33(A)(2) and (6) and Crim.R. 33(B). Willie claimed that he had recently discovered that the state had made a "second plea offer" of 15 years to life, that the trial judge had "refused to allow the second offer to go forward" and that defense counsel had not informed him of the second plea offer. Willie asserted that he discovered these facts when his mother revealed them to him during a December 2005 telephone call, that he was unavoidably

---

[6] Only Owens, Kitt, Bledsoe, Brown and Lucretia Smith testified at the hearing. The affidavits of Donald Laster and Jermel Moore, which had been attached to Willie's motion for a new trial, were not considered or entered into evidence.

prevented from timely discovering them given that no one told him about the second plea offer and that if he had known about the second plea offer, he would have accepted it and waived his right to a jury trial. The trial court denied the motion, and Willie appealed. On July 6, 2006, this court sua sponte dismissed Willie's appeal. *State v. Smith*, 8th Dist. Cuyahoga No. 78229, *appeal not accepted*, Ohio Sup. Ct. No. 06-1566 (Nov. 1, 2006).

{¶ 34} In March 2009, Willie filed another petition for postconviction relief, alleging that he was "legally innocent," that the indictment was defective and did not charge an offense under Ohio law and that he was denied the effective assistance of counsel. The trial court denied the motion and Willie appealed. This court affirmed, concluding that Willie did not satisfy the requirements for untimely filing under R.C. 2953.23(A) and that Willie's claims were barred by the doctrine of res judicata because all of the issues raised were addressed or could have been addressed in his direct appeal. *State v. Smith*, 8th Dist. Cuyahoga No. 93534, 2010-Ohio-1869, *appeal not accepted*, 126 Ohio St.3d 1550, 2010-Ohio-3855, 932 N.E.2d 342.

{¶ 35} On June 21, 2017, Willie filed a "common-law motion to correct void judgment." Willie argued that the jury's finding of not guilty on the felony-murder specification operated as an acquittal and that, therefore, his conviction and sentence for aggravated murder were void. The trial court denied the motion and Willie appealed. Once again, this court affirmed the trial court's judgment finding that Willie's argument was based on an argument previously raised in his direct appeal, i.e., that the trial court had erred in accepting inconsistent verdicts, and was

barred by res judicata. *State v. Smith*, 8th Dist. Cuyahoga No. 106486, 2018-Ohio-2938, *appeal not accepted*, 154 Ohio St.3d 1425, 2018-Ohio-4496, 111 N.E.3d 21.

{¶ 36} On June 1, 2022, Willie filed, pro se, a civil complaint for declaratory judgment against Cuyahoga County Common Pleas Court Judges Steven E. Gall and Timothy J. McGinty. The complaint alleged that the jury's verdict in 1995, finding Willie guilty of aggravated murder in violation of R.C. 2903.01(B), was inconsistent with the jury's resolution of the felony-murder specification attached to the underlying count. The complaint sought, among other relief, a declaration that the sentencing journal entry was insufficient to find Willie criminally liable for the crimes for which he is incarcerated and an order permanently enjoining the Cuyahoga Court of Common Pleas from imposing a sentence for aggravated murder in Case Nos. CR-95-323987-ZA and CR-95-325283-ZA. The trial court granted the defendants' motion to dismiss pursuant to Civ.R. 12(B)(6) for failure to state a claim upon which relief could be granted. On appeal, this court affirmed. *Smith v. Gall*, 2023-Ohio-2692, 222 N.E.3d 786 (8th Dist.), *appeal not accepted*, 171 Ohio St.3d 1477, 2023-Ohio-3789, 219 N.E.3d 977.[7]

**Ashunte's Postconviction Filings**

{¶ 37} In June 2005, Ashunte filed a petition in the Fifth District for a writ of habeas corpus, claiming that his convictions were void because, prior to

---

[7] Willie has also repeatedly sought habeas corpus relief in federal court. *See Smith v. Wilson*, N.D.Ohio No. 1:07 CV 3427, 2008 U.S. Dist. LEXIS 30907 (Apr. 15, 2008); *In re Smith*, 6th Cir. No. 19-3409, 2019 U.S. App. LEXIS 31062 (Oct. 17, 2019); *In re Smith*, 6th Cir. No. 20-3917, 2021 U.S. App. LEXIS 3019 (Feb. 3, 2021).

relinquishing jurisdiction, the juvenile court had failed to comply with the bindover procedures set forth in R.C. 2151.26 and improperly accepted trial counsel's stipulation to probable cause. The Fifth District dismissed the petition, concluding that Ashunte's claims were barred by res judicata and that, in any event, the juvenile court followed the proper bindover procedure. *Smith v. Bradshaw*, 5th Dist. Richland No. 05-CA-66, 2005-Ohio-5403. The Ohio Supreme Court affirmed. *Smith v. Bradshaw*, 109 Ohio St.3d 50, 2006-Ohio-1829, 845 N.E.2d 516.

{¶ 38} On April 3, 2009, Ashunte filed, pro se, a petition for postconviction relief, claiming that he was "legally innocent," that his indictment was defective and that he was denied the effective assistance of counsel. The trial court denied the petition and Ashunte appealed. This court affirmed the trial court, concluding that his petition was untimely and, in any event, his indictment was not defective. *State v. Smith*, 8th Dist. Cuyahoga No. 94110, 2010-Ohio-4492.

{¶ 39} On September 22, 2016, Ashunte filed a second petition for postconviction relief, requesting that the court apply *Montgomery v. Louisiana*, 577 U.S. 190, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016), and *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), and declare his life sentence void because he was sentenced without being afforded a hearing as that prescribed in *Miller*. The state filed a motion to dismiss the petition as untimely. On October 27, 2016, Ashunte filed a motion for summary judgment on his petition and an opposition to the state's motion to dismiss. On October 18, 2018, the trial court denied Ashunte's motion for summary judgment on his petition for postconviction

relief. On October 23, 2019, Ashunte filed a motion for a final, appealable order with respect to his September 22, 2016 petition for postconviction relief. It does not appear that the trial court ruled on that motion, Ashunte's second petition for postconviction relief or the state's motion to dismiss that petition.

**The Motions at Issue Here**

**Ashunte's Motion for Leave to File a Motion for a New Trial**

{¶ 40} On July 14, 2022, more than 25 years after his convictions, Ashunte filed a motion for leave to file a motion for new trial pursuant to Crim.R. 33(A)(6) and (B) and requested a hearing on the motion ("Ashunte's motion for leave"). Ashunte claimed that he had recently discovered new evidence, i.e., an affidavit from Marshall recanting his testimony at Willie's and Ashunte's trials, and argued that he was entitled to a new trial because this new evidence "create[d] a strong probability of a different result at a new trial, specifically that the [s]tate could no longer provide the elements of [a]ggravated [m]urder." In support of his motion, Ashunte attached the affidavit from Marshall, dated January 19, 2022, in which Marshall stated, relevant part:

> 2.  After many years of living a lie my conscience and heart are compelled to tell the truth.
>
> 3.  On March 28, 1995, I was at home at 3267 E. 130th St, Cleveland, OH 44120.
>
> 4.  On that day, Albert Little better known as Uncle Al showed up with Reginald Lewis, the person we both identified as the person who had shot me on February 8th, 1995.
>
> 5.  My uncle, Uncle Al then took Reginald Lewis into the basement.

6. I looked out the window as a lookout.

7. While I was looking out the window, I heard two gun shots.

8. Uncle Al the[n] wrapped up the body of Reginald Lewis and took him outside while I held the door.

9. Uncle Al put him, Reginald Lewis, in his trunk and drove off.

10. I am coming forward now with the truth because I can't stand the false conviction of my cousins any longer.

11. The Warrensville Detectives who interrogated me about the incident threatened me with life imprisonment and told me I would be raped and sodomized in prison.

  * * *

13. I was young[,] terrified, and scared. I had never been to prison and the detectives told me that prison was very dangerous.

14. And the[y] told me they [would] grant me full immunity if I put the murder on Ashunte Smith and Willie Smith.

15. I knew Ashunte Smith and Willie Smith did not kill Reginald Lewis but the police told me to say it was them.

16. Out of fear of prison and fear of being sexually assaulted in prison as descri[b]ed by the Warrensville detectives I complied.

17. I would have come forward sooner but I was afraid.

18. I did not say it was my Uncle Al because I was afraid of Uncle Al (Albert Little) as he was my uncle and I had just seen what he had did to Reginald Lewis.

19. I was scared of retaliation from the Warrensville Detectives and the police in general.

20. I can't see my cousins locked up because of my fears and lies any longer.

21. Therefore, I must tell the truth, which I have done today, the 19[th] day of January, 2022.[8]

**{¶ 41}** Ashunte claimed that he could not have previously discovered the "new material evidence" contained in Marshall's affidavit because (1) he had no "control" over Marshall recanting his prior testimony and his recantation could not have been discovered "until it actually occurred [of] Marshall's own volition," (2) Marshall had been "afraid" to "come forward with this true information sooner" due to the threats made by law enforcement and his fear of "Uncle Al" and (3) Marshall had been given "full immunity" for identifying Ashunte and Willie as the persons who killed Lewis and would not jeopardize his plea agreement.

### Willie's Third Motion for Leave to File a Motion for a New Trial

**{¶ 42}** On March 23, 2023, more than 27 years after his convictions, Willie filed his third motion for leave to file a motion for a new trial pursuant to Crim.R. 33(A)(6) and (B) and requested a hearing on the motion ("Willie's motion for leave"). Willie sought leave to file a motion for a new trial based on (1) the January 19, 2022 affidavit from Marshall "recanting the false testimony he gave at [appellants'] trials" and (2) transcripts from Ashunte's trial showing "significant inconsistencies in the testimony of several key witnesses against him." Willie argued that he was entitled to a new trial based on this "new evidence" because he was innocent of the charges of which he had been convicted and "the [s]tate would have

---

[8] At oral argument, counsel indicated that "Uncle Al" is deceased.

no remaining evidence sufficient enough to uphold an aggravated murder conviction under the requisite evidentiary standard of beyond a reasonable doubt." Willie claimed that he had been unavoidably prevented from discovering this evidence "until long after 120 days from the verdict" because (1) Marshall continued to implicate Willie and Ashunte in Lewis' murder during his testimony in Ashunte's trial, which occurred more than 120 days after Willie's verdicts, and (2) Marshall would not have taken any action to jeopardize his plea agreement with the state, which required him to testify in both Willie's and Ashunte's trials.

{¶ 43} In support of his motion for leave, Willie submitted copies of (1) Marshall's January 19, 2022 affidavit, (2) the transcript from Ashunte's trial, filed with this court on September 4, 1996, and (3) the state's brief in opposition to Willie's initial motion for a new trial, filed on November 19, 1999.

### The Trial Court's Rulings and Appellants' Appeals

{¶ 44} On December 6, 2022, the trial court summarily denied Ashunte's motion for leave to file a motion for a new trial. On July 6, 2023, the trial court summarily denied Willie's motion for leave to file a motion for a new trial. Both Willie and Ashunte appealed. This court, sua sponte, consolidated the appeals for briefing, hearing and disposition. Appellants raise the following seven assignments of error for review:

> Assignment of Error I: The trial court abused its discretion in denying Ashunte and Willie Smith's Motions for Leave to File a Motion for a New Trial as the evidence presented meets the requisite standard under Crim.R. 33.

Assignment of Error II: The trial court abused its discretion when it failed to hold an evidentiary hearing, especially in light of the state's opposition which shows why court intervention is imperative.

Assignment of Error III: The trial court abused its discretion as evidence [sic] by failing to identify the correct legal standard or state findings demonstrating the application of the correct legal standard.

Assignment of Error IV: The trial court abused its discretion when it failed to hold an evidentiary hearing where the state did not oppose Ashunte's transcript as new evidence supporting Willie Smith's motion for leave to file a motion for a new trial.

Assignment of Error V: It is unconscionable to support a conviction with solely the testimony of a witness the state has asserted lacks credibility, and where the record shows per se that the witness had committed perjury, that is an abuse of discretion.

Assignment of Error VI: Where the trial court's denial necessarily relied on a credibility determination, that credibility assessment must be free from bias.

Assignment of Error VII: It is a per se abuse of discretion when the court gives dispositive weight to judicial efficiency over every other principal and purpose of criminal justice.

For ease of discussion, we consider appellants' assignments of error out of order and together, where appropriate.

**Law and Analysis**

{¶ 45} In their first, second and fourth assignments of error, appellants contend that the trial court abused its discretion in denying their motions for leave to file a motion for a new trial without holding an evidentiary hearing.

**Motion for Leave to File Motion for a New Trial under Crim.R. 33**

{¶ 46} Crim.R. 33(A)(6) allows a trial court to grant a new trial where "new evidence material to the defense is discovered which the defendant could not with

reasonable diligence have discovered and produced at the trial" and the defendant's "substantial rights" are "materially" "affect[ed]."

{¶ 47} A defendant whose case was tried to a jury must file a motion for a new trial based on newly discovered evidence within 120 days after the jury's verdict; otherwise, leave of court to file a motion for new trial must be sought and granted. To obtain leave to file an untimely motion for a new trial, the defendant must show "by clear and convincing proof" that he or she was "unavoidably prevented" from discovering the evidence and filing a timely motion for a new trial within the 120-day period. Crim.R. 33(B). Thus, a motion for leave must demonstrate two things: (1) that the defendant has obtained what constitutes newly discovered evidence; and (2) that the defendant was "unavoidably prevented" from timely discovering that evidence.

{¶ 48} "Clear and convincing" evidence is that "measure or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Id.* at 477.

{¶ 49} When a defendant seeks leave to file a motion for a new trial under Crim.R. 33(B), the trial court may not consider the merits of the proposed motion for a new trial unless and until it grants the motion for leave. *State v. Hatton*, 169

Ohio St.3d 446, 2022-Ohio-3991, 205 N.E.3d 513, ¶ 30, 33; *State v. Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, ¶ 41. The sole question before the trial court when considering whether to grant a motion for leave based on newly discovered evidence is whether the defendant has established by clear and convincing proof that he or she was unavoidably prevented from discovering the evidence on which he or she seeks to base the motion for a new trial within the time frame provided, e.g., within 120 days of the jury's verdict. *Hatton* at ¶ 30; *State v. Hale*, 8th Dist. Cuyahoga No. 112163, 2023-Ohio-3894, ¶ 20. A defendant's "mere allegation" that he or she was unavoidably prevented from discovering the evidence he or she seeks to introduce to support a new trial does not meet that burden. *State v. McFarland*, 8th Dist. Cuyahoga No. 111390, 2022-Ohio-4638, ¶ 17; *State v. Hubbard*, 8th Dist. Cuyahoga No. 108853, 2020-Ohio-2726, ¶ 29; *State v. Cowan*, 8th Dist. Cuyahoga No. 108394, 2020-Ohio-666, ¶ 10.

{¶ 50} A witness's recantation of testimony can constitute newly discovered evidence for purposes of Crim.R. 33(A)(6) if the new testimony would "affect[] materially the defendant's substantial rights." Crim.R. 33(A)(6). At both Willie's and Ashunte's trials, Marshall testified that Willie and/or Ashunte shot and killed Lewis. In his affidavit, Marshall states that, contrary to his trial testimony, Willie and Ashunte were not present when Lewis was shot and, further, that "Uncle Al" was the person who actually shot and killed Lewis. Marshall's recantation of his trial testimony could, therefore, provide a basis for granting leave to file a motion for a new trial based on newly discovered evidence if appellants established, by clear and

convincing evidence, that they were unavoidably prevented from filing a timely motion for a new trial based on this evidence.

{¶ 51} A defendant is entitled to a hearing on a motion for leave to file an untimely motion for a new trial only if the defendant submits documents that "on their face" support his or her claim that he or she was unavoidably prevented from timely discovering the grounds for the motion. *See, e.g., State v. McAlpin*, 8th Dist. Cuyahoga No. 110811, 2023-Ohio-4794, ¶ 29; *McFarland* at ¶ 28; *State v. Dues*, 8th Dist. Cuyahoga No. 105388, 2017-Ohio-6983, ¶ 12; *State v. Ambartsoumov*, 10th Dist. Franklin Nos. 12AP-877 and 12AP-878, 2013-Ohio-3011, ¶ 13 (motion for leave to file motion for new trial may be summarily denied where neither the motion nor its supporting affidavits "'embody prima facie evidence of unavoidable delay'"), quoting *State v. Peals*, 6th Dist. Lucas No. L-10-1035, 2010-Ohio-5893, ¶ 22; *State v. Martin*, 8th Dist. Cuyahoga No. 110549, 2022-Ohio-1494, ¶ 36-37 (defendant who submitted evidence that on its face showed he was unavoidably prevented from discovering and presenting evidence sooner was entitled to a hearing on motion for leave to file motion for new trial). Accordingly, the issue before us on appeal is whether appellants submitted documents in support of their motion for leave that "on their face" support appellants' claim that they were unavoidably prevented from timely discovering the grounds for their motion so as to entitle them to a hearing on their motion for leave to file an untimely motion for a new trial.

**Standard of Review**

{¶ 52} We review both a trial court's decision on a motion for leave to file an untimely motion for a new trial and a trial court's decision whether to hold an evidentiary hearing on a motion for leave for abuse of discretion. *Hatton* at ¶ 29; *McAlpin* at ¶ 29; *State v. Gibson*, 8th Dist. Cuyahoga No. 112160, 2023-Ohio-4792, ¶ 21.

{¶ 53} A court abuses its discretion "when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 19; *see also Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35 (describing the "common understanding of what constitutes an abuse of discretion" as "a court exercising its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority"). A decision is an abuse of discretion when it is unreasonable, arbitrary or unconscionable. *See, e.g., State v. Brusiter*, 8th Dist. Cuyahoga No. 112410, 2023-Ohio-3794, ¶ 10; *McAlpin* at ¶ 30; *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A decision is "unreasonable" "'if there is no sound reasoning process that would support that decision.'" *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 106, quoting *AAAA Ents. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). An "arbitrary" decision is "made 'without consideration of or regard for facts [or] circumstances.'" *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, 97 N.E.3d

474, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed.2014). When applying an abuse-of-discretion standard, this court may not substitute its judgment for that of the trial court. *McFarland* at ¶ 21.

{¶ 54} A defendant may make the required showing that he or she was "unavoidably prevented" from filing a timely motion for a new trial based on new evidence by demonstrating that he or she was previously unaware of the evidence on which the motion relies and could not have discovered it within the required time by exercising reasonable diligence. *State v. Johnson*, Slip Opinion No. 2024-Ohio-134, ¶ 18; *Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, at ¶ 21; *McFarland* at ¶ 16.

{¶ 55} A defendant may also make the required showing by establishing that the prosecution suppressed the evidence at issue. *Bethel* at ¶ 25 ("[W]hen a defendant seeks to assert a *Brady* claim in an untimely or successive petition for postconviction relief, the defendant satisfies the 'unavoidably prevented' requirement contained in R.C. 2953.23(A)(1)(a) by establishing that the prosecution suppressed the evidence on which the defendant relies."); *Johnson* at ¶ 16, 18 (a petitioner who files an untimely or successive petition for postconviction relief may show that he or she was unavoidably prevented from discovering the evidence on which the petition relies "by establishing a violation under [*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)]"); *State v. McNeal*, 169 Ohio St.3d 47, 2022-Ohio-2703, 201 N.E.3d 861, ¶ 17 ("a defendant may satisfy the 'unavoidably prevented' requirement contained in Crim.R. 33(B) by establishing that the

prosecution suppressed the evidence on which the defendant would rely in seeking a new trial").

{¶ 56} In their filings before the trial court and their appellate briefs, appellants did not claim a *Brady* violation or that the state otherwise suppressed any of the "new evidence" at issue.[9]  Accordingly, to warrant a hearing on their motions for leave, appellants needed to submit documents with their motions for leave that, on their face, supported their claims that they were previously unaware of the evidence at issue and could not have discovered it within the required time by exercising reasonable diligence.

## Affidavit from Marshall Recanting His Trial Testimony

{¶ 57} Appellants contend that they established that "there was no reasonable opportunity" for them to have discovered Marshall's recantation of his trial testimony within 120 days of the juries' verdicts and that the trial court abused its discretion in denying their motions for leave because (1) this "new evidence" could only come from Marshall; (2) Willie and Ashunte "had no control over" Marshall's decision to recant his trial testimony; (3) "Ohio Supreme Court case law

---

[9] During the rebuttal portion of their oral argument, counsel for appellants argued for the first time that the state's failure to disclose the police officers' alleged threats regarding what would happen to Marshall if he went to prison constituted a *Brady* violation.  Because appellants did not make this argument below or in their appellate briefs, we do not consider it here.  *See, e.g., State v. Roberts*, 150 Ohio St.3d 47, 2017-Ohio-2998, 78 N.E.3d 851, ¶ 85 ("When an appellant's initial brief fails to mention an argument as a basis for reversing the judgment under review, we need not address that argument in deciding the appeal."); *State v. Dixon*, 12th Dist. Butler No. CA2016-04-074, 2016-Ohio-7438, ¶ 17, fn. 3 (declining to address new arguments raised by appellant during oral argument that were not contained within her appellate brief).

supports a finding that evidence was not discoverable where it had not yet come into being" and (4) it is clear from Marshall's affidavit that he would not have taken any action that could have jeopardized his plea deal with the state.

{¶ 58} With respect to Willie, appellants further argue that the record "shows conclusively" that Marshall was not willing to recant his trial testimony during the "120-day window" because "he did not do so at Ashunte's trial" and, instead, continued to identify Willie and Ashunte as the persons who shot and killed Lewis when he testified at Ashunte's trial.

{¶ 59} The state responds that (1) "Marshall's recantation is not newly discovered evidence because Marshall's statements within his affidavit are not credible"; (2) "Marshall's affidavit is contradicted by evidence, independent of Marshall, that implicated [appellants] in assaulting [Lewis] and taking [Lewis] to Marshall's home"; (3) appellants have not shown that they were unavoidably prevented from timely discovering "Marshall's purported misgivings about his trial testimony" because Marshall was a relative, his statement "does not indicate that he was not willing to provide the information earlier" and appellants have not presented any evidence that Marshall was unwilling to speak with appellants or their representatives following the trials and (4) Ashunte "admitted to his own role [in] the kidnapping and initial assault of [Lewis] and also implicates [Willie] as being involved."

{¶ 60} There certainly could be concerns regarding the credibility of Marshall's statements in his affidavit. As stated above, however, "[t]he sole question

before the trial court when considering whether to grant leave is whether the defendant has established by clear and convincing proof that he was unavoidably prevented from discovering the evidence on which he seeks to base the motion for a new trial." *Hatton*, 169 Ohio St.3d 446, 2022-Ohio-3991, 205 N.E.3d 513, at ¶ 30. "When a defendant seeks leave to file a motion for a new trial under Crim.R. 33(B), the trial court may not consider the merits of the proposed motion for a new trial until after it grants the motion for leave." *Id.*; *Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, at ¶ 41 ("[U]ntil a trial court grants leave to file a motion for a new trial, the motion for a new trial is not properly before the court."). Accordingly, the credibility of Marshall's statements does not factor into whether appellants should be granted leave to file a motion for a new trial. The credibility of the evidence can only be considered in resolving the motion for new trial itself. *State v. Minifee*, 8th Dist. Cuyahoga No. 112160, 2024-Ohio-64, ¶ 21; *see also State v. Davis*, 2023-Ohio-1657, 214 N.E.3d 1148, ¶ 29 (9th Dist.) ("[T]he singular threshold consideration in determining whether leave to file a motion for new trial outside of the 120 days permitted by rule should be granted is whether there was clear and convincing evidence that the movant 'was unavoidably prevented from discovering the evidence within the time prescribed * * *.' * * * There is nothing in the language of Crim.R. 33(B) that mentions evaluation of the credibility of affidavits or other new evidence, or whether that new evidence, in this case the key prosecution witness's recantation, is dispositive and justifies a new trial. The determination of the

credibility of affidavits is made later, at the hearing on the motion if a hearing is granted.") (Emphasis deleted.).

{¶ 61} In *Johnson*, Slip Opinion No. 2024-Ohio-134, the Ohio Supreme Court considered what evidence a petitioner needs in order to establish, for purposes of an untimely or successive petition for postconviction relief under R.C. 2953.23(A)(1), that he or she was "unavoidably prevented" from discovering facts involving a recanting witness. The court rejected the argument that an affidavit from a recanting witness, dated after the statutory deadline for filing a timely petition, was, in and of itself, sufficient to establish that a defendant was unavoidably prevented from timely submitting the evidence. The court explained:

> R.C. 2953.23(A)(1)(a) requires a petitioner to show that he was "unavoidably prevented" — not merely "prevented" — from discovering the facts on which he would rely. (Emphasis added.) "Unavoidable" means "not avoidable" or "inevitable." *Merriam-Webster's Collegiate Dictionary* 1360 (11th Ed.2003). And something is "inevitable" if it is "incapable of being avoided or evaded." *Id.* at 638. Keeping in mind that R.C. 2953.23 means what it says, a petitioner filing an untimely postconviction petition must show that any delay in discovering the facts undergirding the petition was "incapable of being avoided or evaded," Merriam-*Webster's Collegiate Dictionary* at 638.

> The light that an affidavit's date sheds on that issue is dim, at best. A date merely reveals when the affidavit was executed or provided, not when the testimony it contains became available. Without an explanation of how the recantation was discovered, the information essential to the R.C. 2953.23 inquiry remains cloaked in darkness. It is this type of information that bears on the petitioner's ability to avoid delay in discovering recanted testimony. * * *

> Accepting an affidavit's date as prima facie evidence satisfying the strictures of R.C. 2953.23(A)(1)(a) would effectively eliminate the word "unavoidably" from the statute. Thus, we hold that R.C. 2953.23(A)(1)(a) requires a petitioner to submit evidence of specific

facts beyond the supporting affidavit's date to explain why the petitioner was unable to timely obtain an affidavit from the recanting witness.

*Johnson* at ¶ 24-25, 27.

{¶ 62} The court also rejected the argument that questions concerning the reasons for a recanting witness affidavit, the timing of a recanting witness affidavit and efforts to discover a recantation must be explored at a hearing:

> [T]he petitioner bears the burden of proving that he was unavoidably prevented from discovering the evidence on which he must rely * * *. Therefore, it is the petitioner's duty to present sufficient evidence to carry that burden at the time he files the petition. And there is no practical reason why a hearing might be necessary for the petitioner to satisfy this burden. If testimony can be elicited at a hearing, it can be attested to in an affidavit. We therefore reject Johnson's argument that regardless of the circumstances, a hearing is required whenever a petitioner produces an affidavit from a witness recanting the witness's testimony.

*Johnson* at ¶ 26.

{¶ 63} In *Johnson*, the only evidence the petitioner, Johnson, had submitted in support of his postconviction petition was an affidavit from the recanting witness, the victim. *Id.* at ¶ 28. In his affidavit, the victim detailed his "doubts" about his trial testimony, his limited recollection of his assailant and his concern that he had improperly identified Johnson as his attacker. *Id.* at ¶ 7. He also explained that he had "felt pressured by [a police detective] to * * * testify against [Johnson] even though [he] wasn't sure [Johnson] was the person who committed these crimes against [him]." *Id.* Although Johnson asserted in his petition, "in conclusory fashion," that the information in the affidavit "was not available to [him] until this

time" and "was not discoverable by him until [the recanting witness] presented it," the affidavit did not state this. *Id.* at ¶ 29. The affidavit contained no information about when or how Johnson learned of the victim's misgivings regarding his identification of Johnson, who contacted whom, when such contact occurred or any other information "about whether Johnson had been prevented, unavoidably or otherwise, from timely discovering [the victim's] uncertainties about his identification of Johnson." *Id.* at ¶ 28-29. Further, the victim claimed in his affidavit that he had "spent the past seven years thinking about [his] testimony" and that he had daily "felt an incredible weight on [his] shoulders" because he believed he did not identify the right person. *Id.* at ¶ 29. Under such circumstances, the court held that Johnson "did not carry his burden" of showing that he was "unavoidably prevented" from discovering the recantation within the statutory deadline. *Id.* at ¶ 8-30, 35.[10]

{¶ 64} Because "'the "unavoidably prevented" requirement in Crim.R. 33(B) "'mirrors the "unavoidably prevented" requirement in R.C. 2953.23(A)(1),'" we must apply the same analysis when determining whether appellants met their burden here. *Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, at ¶ 59, quoting *State v. Barnes*, 5th Dist. Muskingum No. CT2017-0092, 2018-Ohio-1585, ¶ 28; *see*

---

[10] The court also held that Johnson had failed to establish that he would not have been convicted but for a constitutional error at trial under R.C. 2953.23(A)(1)(b). *Id.* at ¶ 31-35.

*also Johnson* at ¶ 16, fn. 3; *State v. Allen*, 8th Dist. Cuyahoga No. 112782, 2024-Ohio-970, ¶ 33.

**{¶ 65}** In *Allen*, this court recently addressed a similar issue. In that case, the defendant, Allen, filed a motion for leave to file a motion for new trial under Crim.R. 33(A)(6) and (B), 11 years after he was convicted of aggravated murder and other charges in connection with a shooting incident that resulted in the deaths of two men and injuries to others. Allen claimed that one of the state's key witnesses at trial, Weems, who had been shot in the incident, had recently recanted his trial testimony identifying Allen as one of the shooters. *Allen* at ¶ 13-14. Weems had testified at trial that although he saw the faces of the shooters, he "didn't know who they was right off" but that he "recognized their face[s]," that he never "forgot a face" and that he later connected the faces to names when another individual, Perkins, visited him in the hospital and told him the names of the two men who were involved the shooting. *Id.* at ¶ 6-8. Although Perkins' existence and identity was known to both the state and the defense at the time of trial, no one interviewed him at that time. *Id.* at ¶ 9, 13. In support of his motion for leave, Allen submitted affidavits from Perkins dated November 2020 (in which Perkins denied visiting Weems at the hospital and denied telling Weems Allen was the shooter) and from Weems dated November 2021 (in which Weems denied seeing who shot him during the incident, denied seeking Perkins in the hospital and claimed that he had identified Allen at trial as the shooter only because the prosecutor told him he would then receive

probation on an unrelated case and he "decided to lie for me [sic] freedom"). *Id.* at ¶ 13-16.

{¶ 66} The trial court denied the motion for leave without a hearing and Allen appealed. *Id.* at ¶ 18-19. Applying *Johnson*, this court affirmed the trial court, concluding that Allen had not shown that the trial court abused its discretion in denying his motion for leave without a hearing based on Perkins' and Weems' affidavits. *Id.* at ¶ 30-38. The court explained:

> In this case, the only evidence Allen presented in support of his claim that he was unavoidably prevented from discovering Weems' recantation were the affidavits from Perkins and Weems. Allen argues that he was "prevented from obtaining [the affidavits] unless and until the individuals were willing to provide those affidavits." However, there is no evidence in the record detailing Allen's efforts, if any, to timely obtain an affidavit from Perkins or Weems or establishing why any such efforts would have been unavailing.
>
> In his motion for leave Allen asserts (unsupported by affidavit) that the path to his discovery of Weems' recantation began when he hired a private investigator in 2020. Allen further asserts that the private investigator located Perkins and obtained an affidavit from him in November 2020. No information is provided in Perkins' affidavit as to how or when the private investigator located Perkins. Allen claims that it was only after obtaining the affidavit from Perkins — in which Perkins disclaimed any role in Weems' identification of Allen * * * — that he (or his private investigator) could approach Weems, but he offers no explanation as to why he could not have reached out to Perkins or Weems sooner. No information is provided in Weems' affidavit as to what led him to execute an affidavit in November 2021 recanting his trial testimony, i.e., whether it was Perkins' statement or something else. Perkins states in his affidavit that no one ever interviewed him regarding the incident.
>
> Allen and his defense attorneys were well aware of the existence of Perkins and his role in the case at the time of trial — if not before. Multiple witnesses, including Weems and police detectives, testified regarding the fact Perkins had allegedly told Weems the names of the

men involved in the shooting. The record reflects also that a private investigator assisted in Allen's defense prior to trial.

In this case, all we have are Allen's conclusory assertions (unsupported by affidavit) that he was unavoidably prevented from discovering Perkins' statement and Weems' recantation within the prescribed time frame. However, "'[m]ere conclusory allegations do not prove that the defendant was unavoidably prevented from discovering the evidence he seeks to introduce as support for a new trial.'" *McFarland*, 2022-Ohio-4638, at ¶ 28, quoting *State v. Cashin*, 10th Dist. Franklin No. 17AP-338, 2017-Ohio-9289, ¶ 17, 20-23 (trial court did not err in denying defendant's motion for leave to file motion for new trial based on evidence contained in new witness affidavits where defendant "failed to produce any evidence regarding his efforts to obtain the witnesses' affidavits"; defendant's statement that he did "everything possible" to obtain the witnesses' testimony was a "conclusory allegation devoid of the detail necessary to determine whether [the defendant] exercised reasonable diligence").

*Id.* at ¶ 34-37.

{¶ 67} Like the affidavits of the recanting witnesses in *Johnson* and *Allen,* Marshall's affidavit did not provide any information regarding the specific circumstances that led Marshall to recant his prior testimony, execute the affidavit at issue and provide it to appellants. Marshall's affidavit provides no information regarding specifically when Marshall decided to recant his testimony, whether appellants (or others acting on their behalf) played a role in that decision (e.g., who contacted whom),[11] what prior communications appellants (or others on their behalf) had with Marshall regarding his testimony, at what point appellants learned

---

[11] Although appellants assert in their appellate brief that "Marshall contacted * * * counsel decades after the deadline for filing a timely new trial motion, and at that time finally disclosed the truth," (Appellant's Br. at 17), no evidence was presented supporting that claim or identifying exactly when or under what circumstances such contact occurred.

of Marshall's willingness to come forward with his recantation, who prepared the affidavit Marshall executed and how and when the affidavit came into the possession of appellants. Appellants did not provide any affidavits from themselves (or from anyone else) detailing these facts or identifying when and under what circumstances appellants learned that Marshall had recanted his trial testimony. Nevertheless,[12] following careful consideration of the record, we believe that Marshall's affidavit, together with other information in the record, presents sufficient operative facts to require an evidentiary hearing on the issue of whether appellants were unavoidably prevented from timely discovering Marshall's recantation of his trial testimony.

{¶ 68} In this case, unlike in *Johnson* or *Allen*, the record contains evidence of specific facts explaining why appellants were unable to timely obtain an affidavit from Marshall. Marshall's statements in his affidavit regarding the circumstances surrounding his plea deal, the terms of his plea deal and the fact that Marshall testified (without recanting) in Ashunte's trial support appellants' claim that they were unavoidably prevented from discovering that Marshall would recant his testimony within 120 days from the jury's verdicts.

{¶ 69} As stated above, the jury's verdicts in Willie's trial were announced on October 6, 1995. Marshall testified in Ashunte's trial on May 17, 1996, more than 220 days later. Given that Marshall's testimony in Ashunte's trial remained consistent with his testimony in Willie's trial, i.e., that Willie and Ashunte killed

---

[12] The submission of affidavits containing such information with a motion for leave to file a motion for a new trial under Crim.R. 33(B) would certainly be the better practice.

Lewis, it could be reasonably concluded that Willie was unavoidably prevented from discovering that Marshall would recant his testimony within 120 days from the jury's verdicts in his case.

{¶ 70} The record further reflects that Marshall entered into a very favorable plea agreement, contingent on his "truthful" testimony against Willie and Ashunte. That plea agreement, pursuant to which Marshall remained in the juvenile system and pled guilty to complicity to involuntary manslaughter — rather than being subject to bindover and tried for murder as an adult — required Marshall to cooperate with police and prosecutors and to testify "truthfully," i.e., to implicate Willie and Ashunte in Lewis' murder, in Willie's and Ashunte's trials. Marshall was sentenced to a juvenile facility "for a term of one year until he's to reach 21 years of age." However, if Marshall held up his end of the bargain, the prosecutor's office agreed to write a letter to ODYS requesting that Marshall be released after one year.[13] Marshall was 16 at the time he entered into the plea agreement and testified in Willie's trial. He was 17 when he testified in Ashunte's trial.

{¶ 71} Based on the particular facts and circumstances here, we find that appellants submitted documents that, on their face, supported their claims that they could not have discovered Marshall's recantation within the required time frame by exercising reasonable diligence. The trial court, therefore, abused its discretion in denying appellants' motions for leave to file a motion for a new trial without a

---

[13] There is no information in the record as to whether the prosecutor's office wrote such a letter or when Marshall was released from the juvenile facility.

hearing as it relates to Marshall's recantation of his trial testimony. We sustain appellants' first and second assignments of error to the extent they relate to Marshall's recantation of his trial testimony. We remand for the trial court to conduct a hearing on appellants' motions for leave to file a motion for a new trial and determine, as to each appellant, whether he has established by clear and convincing proof that he was unavoidably prevented from discovering the information in Marshall's affidavit on which he seeks to base his motion for a new trial within 120 days of the jury's verdict. *State v. Walker*, 8th Dist. Cuyahoga No. 112142, 2023-Ohio-2689, ¶ 21-24.

### New Information Contained within Transcripts from Ashunte's Trial

{¶ 72} Appellants also contend that Willie should have been granted leave to file a motion for a new trial based on "new information contained within Ashunte's trial transcripts."

{¶ 73} In their fourth assignment of error, appellants contend that the trial court abused its discretion in failing to hold an evidentiary hearing on Willie's motion for leave based on the "new information" contained within Ashunte's trial transcripts, because the state "did not oppose the introduction of Ashunte's trial transcripts as new evidence" and, thereby, "conceded that such information was new evidence warranting a hearing." The record does not support this claim. The record reflects that the state disputed appellants' claim that Ashunte's trial transcripts constituted newly discovered evidence as related to Willie's convictions and that the

state opposed Willie's motion for leave to file a motion for a new trial both to the extent it was based on Marshall's affidavit and to the extent it was based on "new information" contained within Ashunte's trial transcripts. Appellant's fourth assignment of error is overruled.

{¶ 74} In their first and second assignments of error, appellants contend that the trial court abused its discretion in denying Willie's motion for leave to file a motion for a new trial because Ashunte's trial transcripts contained "new information" that "could not have been discovered within 120 days after Willie's trial." The state responds that the trial court properly denied Willie's motion for leave because (1) "[a]ppellants utterly fail to explain why the use of trial transcripts in a post-conviction proceeding or motion would require reversal here or why * * * this would warrant a trial court granting leave" and (2) "[w]ere [a]ppellants['] arguments adopted, this Court would blur the line between newly available and newly discovered." (Emphasis deleted.)

{¶ 75} Willie does not identify, either in his motion for leave or in his appellate briefs, precisely what "new information" he claims to have discovered in Ashunte's trial transcripts. In their appellate briefs, appellants refer generally to "the statements Marshall made during [h]is testimony at Ashunte's trial" and assert that "[w]hen comparing the testimony William Marshall and his grandmother, Sarah Marshall, provided in Ashunte's trial versus that provided in Willie's trial it is

clear that there were significant inconsistencies at that time."[14]  In his motion for leave to file a motion for a new trial, Willie described the "new evidence" relating to "[t]rial testimony from Ashunte Smith's 1996 murder trial" as "[t]he testimony of [s]tate's witnesses, William Marshall and Sarah Marshall, [that] contradicted their testimony in Willie's case in significant and material ways."  In their appellate briefs, appellants merely summarize William Marshall and Sarah Marshall's testimony at his trial and in Ashunte's trial as part of the background facts.  Appellants do not identify, in their arguments, the specific alleged "inconsistencies" or "contradictions" in the testimony that they contend constitutes "new evidence" warranting a new trial.  *See* App.R. 16(A)(7) ("The appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the * * * parts of the record on which appellant relies.").  "It is not the role of this court to make arguments for a party."  *State v. Harris*, 8th Dist. Cuyahoga No. 109083, 2020-Ohio-4138, ¶ 31; *see also State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 56 (8th Dist.) ("An appellate court is not obliged to construct or develop arguments to support an appellant's assignment of error and 'will not "guess at undeveloped claims on appeal."'"), quoting *State v. Piatt*, 2020-Ohio-1177, 153 N.E.3d 573, ¶ 39 (9th Dist.), quoting *McPherson v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit No. 21499, 2003-Ohio-7190, ¶ 31;

---

[14] Further, this claim contradicts other statements made in appellants' brief, including that "Marshall's affidavit is entirely consistent with his trial testimony with the exception of one critical detail — who killed Reginald Lewis."

*State v. Collins*, 8th Dist. Cuyahoga No. 89668, 2008-Ohio-2363, ¶ 91 ("'[I]t is not the duty of this Court to develop an argument in support of an assignment of error if one exists.'"), quoting *State v. Franklin*, 9th Dist. Summit No. 22771, 2006-Ohio-4569, ¶ 19; App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based * * * as required under App.R. 16(A).").

{¶ 76} In any event, appellants' arguments with regard to William Marshall's testimony would appear to be moot given that Marshall has now allegedly recanted his testimony from Ashunte's trial. With respect to Sarah Marshall's testimony, even assuming Sarah Marshall provided additional or different testimony in Ashunte's trial than that she provided in Willie's trial, Willie has not submitted documents that, on their face, support Willie's claim that he was unavoidably prevented from timely discovering any such "new evidence."

{¶ 77} Simply because the transcripts from Ashunte's trial did not exist until after Ashunte's trial and, thus, Willie could not have discovered those transcripts within 120 days after the jury's verdict, does not mean that Willie was unavoidably prevented from timely discovering any "new evidence" allegedly contained within those transcripts within 120 of the jury's verdict in his case.

{¶ 78} Evidence is not undiscoverable simply because no one looked for it. *See, e.g., McFarland*, 2022-Ohio-4638, at ¶ 25 ("'A defendant cannot claim that evidence was undiscoverable merely because the defendant or his defense counsel made no effort to obtain the evidence sooner.'"), quoting *Hubbard*, 2020-Ohio-

2726, at ¶ 56; *Hale*, 2023-Ohio-3894, at ¶ 31 (same); *State v. Collins*, 8th Dist. Cuyahoga No. 108486, 2020-Ohio-918, ¶ 45 ("It is the duty of the criminal defendant and his trial counsel to make a serious effort, on their own, to discover potential, favorable evidence. * * * Claims that evidence was undiscoverable simply because the defense did not take the necessary steps earlier to obtain the evidence do not satisfy the requisite standard [under Crim.R. 33(B)]."). The date of the trial transcript merely reveals when the trial testimony was provided, "not when the testimony it contains became available." *Johnson*, Slip Opinion No. 2024-Ohio-134, ¶ 25.

{¶ 79} Sarah Marshall is Willie's grandmother. She testified that Willie had visited her often prior to this incident and that she "got a lawyer for all [her] grandsons" following the incident. Crim.R. 33(B) requires a defendant to submit evidence of specific facts to explain why the defendant was unable to timely obtain the "new information" at issue. Willie has not done that here with respect to Sarah Marshall's testimony.

{¶ 80} Accordingly, we overrule appellants' first and second assignments of error to the extent that they relate to "new information" contained within Ashunte's trial transcripts.

**Findings of Facts and Conclusions of Law**

{¶ 81} In their third assignment of error, appellants contend that the trial court erred in failing to issue findings of facts and conclusions of law when denying their "new trial motions." Appellants argue that without such findings, the appellate

court cannot be certain that the trial court applied the correct legal standard in denying their motions and "thus the denial of the new trial motion was improper as the court cannot say that the judge did not abuse her [sic] discretion."

{¶ 82} This appeal involves the denial of appellants' motions for leave to file a motion for a new trial. While it is certainly a "best practice" for a trial court to issue findings of fact and conclusions of law when denying a motion for leave to file a motion for a new trial, Crim.R. 33 does not require a trial court to do so, and appellants have not cited any other authority that would require the trial court to issue findings of fact or conclusions of law under the circumstances here. *See, e.g., State v. Sutton*, 2016-Ohio-7612, 73 N.E.3d 981, ¶ 26 (8th Dist.); *State v. Hillman*, 10th Dist. Franklin Nos. 20AP-244 and 20AP-245, 2020-Ohio-5597, ¶ 6-7. *But see Gibson*, 2023-Ohio-4792, at ¶ 14, fn.1 (citing *State v. Miller*, Slip Opinion No. 2023-Ohio-3448, ¶ 26, 36, "a split decision without a majority," and observing that "both the concurrence and the dissent agree that, when denying a motion for leave to file a new-trial motion, trial courts should, as a matter of best practice, make findings of fact and conclusions of law because those determinations by the trial court and its reasoning are essential for the appellate courts' review of an appeal").

{¶ 83} Further, based on our resolution of appellants' first two assignments of error, this assignment of error is arguably moot. Accordingly, we overrule appellants' third assignment of error.

**Appellants' Remaining Assignments of Error**

{¶ 84} Appellants' fifth, sixth and seventh assignments of error concern the merits of appellants' motions for a new trial and whether the trial court abused its discretion in failing to hold an evidentiary hearing on appellants' motions for a new trial.

{¶ 85} Here, however, the trial court ruled only on appellants' motions for leave to file a motion for a new trial. Having denied leave, the trial court never addressed the merits of appellants' motions for a new trial or whether an evidentiary hearing should be held on those motions. *See, e.g., Hatton*, 169 Ohio St.3d 446, 2022-Ohio-3991, 205 N.E.3d 513, at ¶ 30, 33; *see also State v. Ali*, 8th Dist. Cuyahoga No. 112285, 2023-Ohio-2587, ¶ 8 (disregarding assignment of error relating to motion for a new trial "because it addresses a motion [appellant] was never permitted to file"). Accordingly, we overrule appellants' fifth, sixth and seventh assignments of error.

**Conclusion**

{¶ 86} Crim.R. 33(B) puts the onus on a defendant to show that he or she was unavoidably prevented from timely discovering the "new evidence" on which a motion for a new trial is based. Appellants are entitled to a hearing on their motions for leave to file a motion for a new trial as it relates to the affidavit of William Marshall because Marshall's affidavit on its face, together with other evidence in the record, supports appellants' claim that they were unavoidably prevented from

discovering Marshall's recantation of his trial testimony within 120 days of their juries' verdicts.

{¶ 87} Judgment affirmed in part and reversed in part. Cases remanded for a hearing on appellants' motions for leave to file a motion for a new trial based on William Marshall's recantation of his trial testimony.

It is ordered that appellants recover from appellee the costs herein taxed.

The court finds that there were reasonable grounds for these appeals.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
MICHAEL JOHN RYAN, J., CONCUR